**TAMPA ELECTRIC COMPANY et al.,**
**Plaintiffs**

v.

**STONE & WEBSTER ENGINEERING CORPORATION et al., Defendants-3rd Party Plaintiffs,**

v.

**ROYAL INDEMNITY COMPANY,**
**Third-Party-Defendant.**

**Civ. No. 69–479 T–K.**

United States District Court,
M. D. Florida,
Tampa Division.

Oct. 26, 1973.

C. Lawrence Stagg and John Germany of Holland & Knight, Tampa, Fla., for Tampa Electric Co.

William R. Hapner of Wagner, Cunningham, Vaughan, Hapner & May, Tampa, Fla., for Continental Ins.

William C. Frye, Trenam, Simmons, Kemker, Scharf & Barkin, Tampa, Fla. (on Stone & Webster's Counterclaim) (C. Lawrence Stagg, Tampa, Fla., on main claim), for Royal Indemnity Co.

T. Paine Kelly, Jr., Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for Westinghouse Electric.

Ralph C. Dell of Allen, Dell, Frank & Trinkle, Tampa, Fla., Laurence V. Senn, Jr., Donald J. Zoeller, John J. Kirby of Mudge, Rose, Guthrie & Alexander, New York City, for Stone & Webster Eng.

T. Paine Kelly, Jr., Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for Liberty Mutual Ins. Co., John Peter Fredk Green (Lloyd's # CU6407).

R. Corbin Glos, W. M. Carson of Glos & Carson, Tampa, Fla., for Geoffrey Valentine.

Don M. Stichter, Tampa, Fla., and Robert G. Schloerb & Richard L. Blatt of Peterson, Ross, Rall, Barber & Seidel, Chicago, Ill., for George Milton (Lloyd's # # CU 8147, 8148).

William A. Gillen of Fowler, White, Gillen, Humkey, Kinney & Boggs, Tampa, Fla., Harding A. Orren of Robins, Davis & Lyons, Minneapolis, Minn., for Royal Indemnity Co. (third party defendant).

## MEMORANDUM OPINION AND ORDER

KRENTZMAN, District Judge.

This is a suit for damages arising out of a fire which occurred on November 30, 1968, at Gannon Station, an electric generating plant owned by Tampa Electric Company (TECO) located in Hillsborough County, Florida.

In late 1964 Westinghouse Electric Corporation submitted a proposal to sell a turbine generator unit to TECO in response to an invitation to bid and specifications prepared by Stone & Webster Engineering Corporation. TECO bought the unit from Westinghouse for $6,216,999.02 and paid Stone & Webster $1,634,614 for services relating to the erection of the turbine generator. This new addition to the Gannon station generator family was named Unit number 6.

For some reason a fracture occurred in a high pressure oil line on the Unit 6 generator. A fire erupted which caused substantial damages. Unit 6 was inoperative until August 18, 1969, and some of the other turbine generator units at Gannon Station were out for lesser periods.

TECO sued both Stone & Webster and Westinghouse to recover the damages it sustained because of the fire. Each party proffered its theory as to how the blame should rightly rest on the other two. Eventually Continental Insurance Company (Continental) and Royal Insurance Company (Royal) were joined as party plaintiffs; various other insurance companies were added as defendants. Finally, after nearly four years of pleadings, motions and discovery, the lawsuit spawned by the conflagration showed signs of being under control.

At the pretrial conference it was agreed that there were a number of issues that could be severed and treated separately. It was further agreed that some of these issues could be determined by the Court prior to the trial on liability. An order was entered to that effect on September 28, 1973.

Accordingly, this opinion will resolve the following pretrial issues.[1] (1) Does Royal Insurance Company have a duty to defend Stone & Webster; (2) Has Continental waived its right to subrogation against Westinghouse; (3) Has Royal waived its right to subrogation against Westinghouse; (4) Are plaintiffs entitled to interest on damages to property under the circumstances of the instant claims; (5) Can TECO claim loss of "capacity charges" as an element of its damages; (6) Can damages be apportioned among joint tortfeasors under the law of Florida applicable in this case; (7) Is comparative negligence a defense to claims other than simple negligence.

## ROYAL'S DUTY TO DEFEND STONE & WEBSTER

In a third party complaint, Stone & Webster asserts that since the action brought against it by TECO is of a type covered by a Royal insurance policy, Royal is obligated to defend Stone & Webster and thus to pay any costs of defending.[2]

It is undisputed that Royal issued a Comprehensive General Liability Policy and that the policy and related contract were in full force and effect on the date of the accident giving rise to instant case.

■■■ A liability insurer's duty to defend an insured must be determined from the allegations contained in the complaint filed in the suit or proceeding against the insured. If the pleading states claims of injury or damage which are covered by the policy, the insurer must defend. Coblentz v. American Surety Co. of N. Y., 416 F.2d 1059, 1062 (5 Cir. 1969); Burton v. State Farm Mutual Automobile Insurance Co., 335 F.2d 317, 321 (5 Cir. 1964); Tampa Ship Repair & Dry Dock Co., Inc. v. Aetna Casualty & Surety Co., No. 72–187 Civ. T–K, M.D.Fla., Sept. 27, 1973; New Amsterdam Casualty Co. v. Knowles, 95 So.2d 413 (Fla.1957). And

---

1. By stipulation between Continental, TECO and Stone and Webster it was agreed that two issues set out in the pretrial order as being suitable for pretrial determination be decided after trial. These issues relate to whether Continental has waived its right to subrogation against Stone & Webster and whether Stone & Webster is liable for the amount spent by TECO in repairing certain damages. Having received no objection to the stipulation, the Court will comply with the agreement.

The Court was also informed that Stone & Webster's counterclaim against Royal cannot be decided as a matter of law. Accordingly this issue will remain severed and will be tried at a later date. Jury trial has been waived.

2. At the request of Stone & Webster, Royal originally employed the law firm of Mudge, Rose, Guthrie and Alexander of New York to defend Stone & Webster. That law firm then requested Royal to retain the firm of Allen, Dell, Frank & Trinkle of Tampa as local counsel. Royal did so. All legal fees were paid by Royal until it learned that the claims asserted by TECO against Stone & Webster included claims not covered by Royal's policy. Thereafter Royal declined to pay any of the expenses of defending Stone & Webster. Because of this refusal and cut back of appropriations for legal fees, nearly $200,000 in defense costs had been held back as of June 30, 1973.

while it is true that an insurance company need not defend against a suit claiming damages not covered by its policy, the determination of whether a duty exists is made at the time the suit is brought, not after the suit is reduced to judgment.

Therefore since the duty to defend is controlled by the original pleadings, and since the effect of the policy clauses is that the insurer undertakes to defend claims of the type for which it would have to make payment, the complaint against Stone & Webster should be examined to determine if it claims liability of a type covered by the Royal policy. If some of the claims are within the coverage provided, and some are outside the policy provisions, and the covered claim alone would compel coverage, then Royal is obligated to defend against both the covered and non-covered claims. *See* St. Paul Fire & Marine Insurance Co. v. Icard, Merrill, Cullis & Timm, P.A., 196 So.2d 219 (2d D.C.A.1967). *See also* Gulf Insurance Co. v. Dooley, 286 F.Supp. 16 (N.D.Ill. 1968); Vappi & Co. v. Aetna Casualty & Surety Co., 348 Mass. 427, 204 N.E.2d 273 (1965); Lionel Freedman, Inc. v. Glen Falls Insurance Co., 27 N.Y.2d 364, 318 N.Y.S.2d 303, 267 N.E.2d 93 (Ct. App.1971).

The Tampa Electric Company complaint contains the following allegations upon which it has based its claim for property damages against Stone & Webster:

> "S&W breached the 1954 contract in a number of respects, including, but not limited to, its failure to make all necessary engineering studies and determinations, to recommend to TECO the type and character of equipment and of construction required, to prepare proper plans and specifications for equipment, material and construction work and to execute the construction and install the machinery and equipment as required under the said contract." (Count I p. 13).

> "In connection with its agreement to design and construct Unit 6, S&W made the following implied warranties to TECO: a) Unit No. 6 would be merchantable; b) that Unit No. 6 would be fit for the generation of electricity, which was the purpose for which TECO intended to use it, as was known to S&W." (Count III p. 3).

> "The Defendants, and each of them, were negligent in the design, construction, installation, inspection, adjustment and testing of Unit 6 . . ." (Count IV p. 2).

The pertinent portion of the insurance policy reads as follows:

## "INSURING AGREEMENTS

### XXX

Coverage B—Property Damage Liability

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof.

"With respect to such insurance as is afforded by this policy, the company shall: a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent. . . ."

## "EXCLUSIONS

This policy does not apply: . . . under coverage B . . . to injury to or destruction of property caused by the insured's improper, inadequate or faulty plans, design or specifications."

The claims charging Stone & Webster with negligent installation of Unit 6 are clearly within the policy coverage. The allegations of negligent design, however, are not covered by virtue of the exclusionary clause quoted above.

Since the complaint states a covered claim, Royal has a duty to defend Stone & Webster even though a non-covered claim is also alleged. Royal must pay Stone & Webster's cost of conducting its defense of the TECO complaint.[3]

Royal urges that because the claim of negligent design is not covered by its policy, but may be covered by another insurer,[4] that the costs of defendant Stone & Webster must be somehow prorated to reflect the respective costs of defending the covered and non-covered claims.

The duty of Royal to defend both the covered and non-covered claims gives rise to a correlative duty to pay the costs of defending both such claims. *See* St. Paul Fire & Marine Insurance Co. v. Hodor, 200 So.2d 205 (3 D.C.A. Fla.1967); Town and Beach Plumbing Co. v. American Fire & Casualty Co., 157 So.2d 700 (2 D.C.A.Fla.1963). Whether there is another insurance company involved which should also be responsible for all defense costs, and, if so, whether the two insurance companies would then be entitled to split the costs of defending, are issues not now before the Court.

The determination of Royal's duty to defend Stone & Webster was initiated on opposing motions for partial summary judgment. For the reasons enumerated herein, Stone & Webster's motion for partial summary judgment is hereby granted as. to Royal's duty to defend and to pay the costs of defending. Roy-

al's motion for partial summary judgment is hereby denied.

Although Royal's liability for Stone & Webster's defense costs is hereby determined, establishing the amount of the monetary obligation must await the termination of the litigation.

HAVE CONTINENTAL AND ROYAL WAIVED THEIR RIGHT TO SUBROGATION AGAINST WESTINGHOUSE?

When TECO suffered the loss of its Gannon station Unit # 6, it had two policies of insurance applicable to the loss: A Comprehensive Business Policy issued by Continental and a Boiler and Machinery Policy issued by Royal. Under these policies TECO has received over five million dollars from Continental and over one million from Royal to compensate for covered damage. Because of their payments, both of the insurance companies claim to be subrogated to TECO's claims against defendants.[5]

Westinghouse contends that because of certain clauses within the policies issued to TECO by Continental and Royal the insurance companies have waived their right to claim subrogation and therefore they cannot recover from Westinghouse the amounts they paid to TECO.

*Continental's policy—*

The policy issued by Continental to TECO contained the following clause:

"(c) WAIVER OF SUBROGATION CLAUSE: It is expressly understood

3. This is not to say that Royal would be obligated to pay all defense costs irrespective of all future developments. It is possible that the claim for negligent installation would be dropped or settled. In that case Royal would not be required to proceed with the defense of the uncovered claim. Until a similar eventuality arises, however, Royal is responsible for all costs incurred in defending Stone & Webster.

4. Royal asserts that Stone & Webster has a policy with Lloyd's of London (Insurance Cover Note No. SD 1082/CU8148) which provides liability coverage for negligence in design and also provides for defense of covered claims over $1,000,000.

Stone & Webster has not filed a third party complaint against Lloyd's or in any other way demanded a defense from Lloyd's. Thus the issue of whether the Lloyd's policy, with its $1,000,000 deductible provision, gives rise to the same duty to defend as found to exist in Royal's policy cannot, and should not be reached at this time.

5. Whether Continental has a right to subrogation against Stone & Webster is an issue that has been severed and which will be determined after the trial to determine ultimate liability for the fire has been completed. Royal has stipulated that it has no right to subrogation against Stone & Webster.

and agreed that this insurance shall not be invalidated should the insured waive or have waived prior to loss any or all rights or recovery against any party for loss occurring to the property described herein or affected thereby;. *and where work is let on a cost plus basis, it is agreed that in case of loss or damage by fire this Company shall not exercise the right of recovery against any contractor and/or subcontractor if such contractor and/or subcontractor should charge back to the Insured the amount (or any part hereof) recovered by this Company.*" (Emphasis added)

Thus in this provision it was agreed between TECO and Continental that Continental would waive its right of subrogation as to contractors or subcontractors (1) where work was let on a cost plus basis and (2) if the contractor or subcontractor could charge back to TECO the amount recovered against the contractor or subcontractor by Continental.

Westinghouse claims that it is one of those subcontractors as to which there has been a waiver of subrogation by the above-quoted clause. It contends that in furnishing the turbine generator and auxiliary equipment, and in providing technical assistance in the installation and erection, Westinghouse was acting as a subcontractor under Stone & Webster. To fulfill the cost plus prerequisite of the waiver of subrogation clause, Westinghouse argues that the cost of the generator and services provided by it were part and parcel of the cost plus contract between TECO and Stone & Webster. To round out its alleged immunity under the waiver of subrogation clause Westinghouse claims that it has the same right to "charge back to the insured" any amount recovered against it to the same extent that it can charge back any amount recovered from Stone & Webster.

This Court is of the opinion that Westinghouse's theory cannot stand. It is difficult to accept the theory that Westinghouse meets the "cost plus" requirement of the waiver clause; it is impossible to accept the further contentions that Westinghouse is a subcontractor which has the ability to charge back to TECO any amounts recovered against it by Continental.

Whether one considers Westinghouse a subcontractor or not, it is evident that Westinghouse itself did not work on a cost plus basis. The purchase order leaves no doubt that Westinghouse was to furnish the turbine generator and the supervision for erecting it for a lump sum price. This single price included its profit. There is nothing "cost plus" about the financial arrangement involving Westinghouse.[6]

The generating unit was purchased in the name of TECO through a purchase order issued by its purchasing agent Stone & Webster. A direct contractual relationship exists between Westinghouse and TECO. Stone & Webster was merely the purchasing agent. In these contractual circumstances, Westinghouse could not be considered a subcontractor.

Moreover, even if Westinghouse could be rightfully deemed a subcontractor working on a cost plus basis, there is nothing in the record to support Westinghouse's assertion that it could charge back to TECO any amount recovered against it by TECO's insurance carrier. Westinghouse claims that Stone & Webster does have such a right and that Westinghouse "has the same right under the contract as Stone & Webster since Westinghouse is Stone & Webster's subcontractor." This line of reasoning is without merit. It has yet to be determined whether Stone & Webster does indeed have the right to "charge back".

---

6. Westinghouse contends that the waiver of subrogation clause does not require it to be a cost plus contractor, but rather to be a subcontractor who is participating in work originally let on a cost plus basis. Whether the waiver clause is susceptible to such an interpretation need not be determined since, as is discussed *infra*, Westinghouse is not a subcontractor.

**34**

If Stone & Webster does it will be because there has been a contractual agreement to that effect between TECO and Stone & Webster allowing such charge-backs. Westinghouse cannot benefit even if such an agreement did exist.[7]

For the foregoing reasons it is clear that Continental did not waive its right to subrogation against Westinghouse in the waiver clause contained in the Comprehensive Business Policy issued to TECO.

*Royal's Policy—*

The Boiler and Machinery Policy issued by Royal to TECO also contained a waiver of subrogation clause:

It is agreed that condition 10 of the policy is amended to include the following: the company agrees to waive any right of subrogation against contractors working for the assured on a 'cost-plus' basis.

Westinghouse argued with some force to demonstrate that it was a *sub*contractor in order to come within the terms of Continental's waiver of subrogation clause. To come within Royal's waiver clause would require Westinghouse to demonstrate its status as a contractor. Apparently not feeling this demonstration is required, Westinghouse instead argues that the intent of Royal's clause is to include subcontractors as well.

Westinghouse cannot seriously demonstrate that it was any type of contractor working on a cost plus basis. The purchase order reveals that Westinghouse was to furnish a turbine generator and supervise the installation for a lump sum price. Thus Westinghouse was not one of the contractors contemplated by the Royal waiver of subrogation clause. Royal did not waive its right of subrogation against Westinghouse in its Boiler and Machinery Policy issued to TECO.

## MAY TAMPA ELECTRIC COMPANY CLAIM LOSS OF CAPACITY CHANGES AS AN ELEMENT OF ITS DAMAGES?

At the time of the fire in the Gannon plant, TECO had a contract with Florida Power Corporation (FPC) whereby FPC was entitled to receive a portion of the power generated by Unit Number 6. Apparently TECO agreed to allocate to FPC 200,000 kilowatts of the capacity of Unit 6. In addition to its agreement to pay for this capacity allotment, FPC agreed to make separate payments for the energy which it actually used from its share of the capacity.

Although it is undisputed that FPC did not owe TECO for any energy charges while Unit 6 was out of service, there is a disagreement over the interpretation of the contract as it related to the capacity payments. TECO contends that, under the contract, FPC was obligated to pay the capacity charge even though the unit was down. FPC disagrees and asserts that as long as the unit was out of operation, there was no obligation on its part to pay the capacity charge. After the fire FPC refused to pay these charges and TECO brought suit against FPC in the Circuit Court of the Thirteenth Judicial Circuit of Florida, in and for Hillsborough County. The Circuit Court entered a final summary judgment against TECO. The Second District Court of Appeal reversed on the grounds that the contract

---

7. In the 1954 contract between TECO and Stone & Webster there was a clause that obligated TECO to pay for the cost of rebuilding any of the work destroyed. It is Stone & Webster's theory that such a clause allows it to charge back amounts recovered against it by Continental. Whether such a clause can be construed to protect Stone & Webster would be entitled to assert that Continental had thereby waived subrogation, has yet to be determined. See Note 1 *su-* *pra.* Westinghouse, however, has no such contract with TECO that could arguably be construed to allow it to charge back to TECO the damages caused through Westinghouse's fault. "It is never presumed that a contract is intended to protect one against his own negligence, and hence, unless it clearly so states, the courts hold that such was not the intention." Smith v. Ryan, 142 So.2d 139, 141 (2 D.C.A.Fla.1962).

was ambiguous and that upon considering parole evidence genuine issues of material fact as to interpretation still existed. The case was remanded and is still pending in the Circuit Court.

In the instant case TECO is claiming as an element of its damages against Westinghouse and Stone & Webster the loss of $1,953,978 in capacity charges it would have received from FPC had the Gannon Unit No. 6 not been out of operation because of the fire. Westinghouse naturally opposes this.

TECO argues the principle that tortfeasors take plaintiffs as they find them. Had the fire not occurred, the argument goes, Unit 6 would have been operative and TECO would have received the capacity charges. Because of the fire TECO is damaged by not receiving them.

Moreover, TECO claims that since Westinghouse allegedly caused the fire, it cannot take advantage of a contractual arrangement TECO happened to have for the use of Unit 6, particularly when the interpretation of the contract is in dispute.

Thus TECO seeks to have this Court declare that it is in fact entitled to the capacity charges under the contract with FPC and that it may properly claim such charges as an element of its damages flowing from the alleged wrongful conduct of defendants in causing the fire.

Westinghouse points to troublesome inconsistencies in TECO's theory. If this Court were to hold as a matter of law that TECO is entitled to the capacity charges from FPC, such a holding would run in direct contrast to the holdings of the Circuit Court of Hillsborough County and the Second District Court of Appeal. The state lower court held that FPC was entitled to summary judgment and the appellate court, 267 So.2d 110, reversed only on the ground that there were outstanding issues of fact.

Another inconsistency is seen in TECO taking one stand as to the interpretation of the FPC contract in state court and another stand in this court. TECO's state court contention is that FPC was liable for the charges whether or not the unit was operating. In this case TECO is arguing that perhaps FPC could refuse to pay the capacity charges when the Unit was inoperative. Therefore, this argument goes, defendants, being liable for the unit breakdown, are liable for FPC's refusal.

It is true that for this Court to hold as a matter of law FPC was obligated to pay TECO for the capacity charges whether or not Unit 6 was operational would not only do violence to the *Erie* doctrine but would also disregard the findings of state courts which have taken exhaustive evidence on the matter. *See* Tampa Electric Co. v. Florida Power Corp., *supra* at 110 of 267 So.2d. Such a holding, however, is unnecessary. TECO does not seek a determination from this Court as to whether FPC is obligated to pay the capacity charges as a matter of law. Recovery of the charges as damages against defendants is what is sought. Regardless of whether the contract required FPC to pay the charges during the unit outage, TECO was entitled to receive payment if no fire occurred. Because of the fire FPC refused to pay. Whether the refusal was justified is being thrashed out in the state court. Notwithstanding the ultimate state determination, money TECO would have collected had there been no fire has gone uncollected. FPC agreed to take some of TECO's capacity and, because of the fire, TECO was unable to make capacity available.

█ Contrary to Westinghouse's assertion, the loss of the capacity charges was the natural, direct and proximate result of the fire. The case cited by Westinghouse does not support its position. In Tennessee Corp. v. Lamb Bros. Construction Co., 265 So.2d 533 (2 D.C. A.Fla.1972), a manufacturer which used gas in its operation, sued a land clearing company for damages occasioned by the clearing company's bulldozer striking a gas pipeline. The Court found that as-

suming negligence, such negligence was not the proximate cause of the manufacturer's damages. There, however, when the pipeline broke it cut off the supply to Florida Gas Co. which was then unable to supply its customers, one of which was the manufacturer plaintiff, with its allotment. The pipeline breakage occurred about 100 miles from the manufacturer and was brought on by a bulldozer clearing some land. The appellate court felt such a chain of events may have justified the trial court in holding that the injuries were not the natural and probable consequence which a prudent person could have foreseen. *Id.* at 536. Clearly when Westinghouse agreed to sell the turbine generator it must have foreseen that TECO would enter into contracts to sell the electric power to be generated. If Westinghouse were negligent, the loss of such contracts would be the natural and proximate result of that negligence. TECO may claim the loss of the capacity charges as an element of its damages in the instant case.

## ARE PLAINTIFFS ENTITLED TO INTEREST ON DAMAGES TO PROPERTY?

Westinghouse makes the contention that since TECO is attempting to recover damages for the loss of use of its property, the allowance of interest on the property damage would therefore constitute a double recovery.

■ Under Florida law the plaintiff is entitled to interest on the amount determined to be due because of the damage to the property. Jacksonville, T. & K. W. Ry. Co. v. Peninsular Land Transp. & Mfg. Co., 27 Fla. 1, 9 So. 661 (1891); Zorn v. Britton, 120 Fla. 304, 162 So. 879 (1935). Since the subrogated insurance companies stand in the shoes of TECO to the extent they paid TECO for property damages, they are entitled to recover interest on that amount; TECO is entitled to interest on the property damage not covered by insurance.

■ Westinghouse's claim that awarding interest would amount to affording a double recovery on the loss of use claim is incorrect. It appears that the claim for "loss of use" on the part of TECO is a claim for the profits it lost during the time the generator was not functioning. TECO is not seeking to recover the rental value of the property while it was out of use.

■ The justification for awarding interest on property damages is to reimburse the injured party for what he would have earned on the money used to repair the damaged property until the time of the entry of the judgment. This is separate from the claim for profits lost by the plaintiff during the time it could not use its equipment while it was being repaired. These are two separate elements of damage. Being no duplication there is no double recovery.

The matter of interest on property damages will be submitted to the jury with instructions concerning the specific elements of damage upon which interest should be computed. The jury will decide the amount of the award.

## SHOULD DAMAGES BE APPORTIONED AMONG JOINT TORTFEASORS?

In July of this year the Supreme Court of Florida abolished the doctrine of contributory negligence. In Hoffman v. Jones, 280 So.2d 431 (Fla.1973) that Court, recognizing the inequities of the former rule, made comparative negligence a part of Florida's tort law.

The parties in the instant case now question the effect of the *Hoffman* case on an equally old theory of "no contribution between joint tortfeasors." The *Hoffman* court expressly declined to address this issue for want of ripeness. *Id.* at 439.

■ The role of a federal district Court in this situation is clear. Since the district court in a diversity case in effect sits as a state court, Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967),

and since there has been a shadow cast over an established doctrine, *cf.* Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 205, 76 S.Ct. 273, 100 L. Ed. 199 (1956), the district court must consider all the data the Supreme Court of Florida would use in an effort to determine how that Court would decide. *See e. g.* Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 851 (2 Cir. 1967).

Fortunately the *Hoffman* Court provided guidance for courts faced with the problems created by the change to a comparative negligence rule:

"The answers to many of the problems will be obvious in light of the purposes for which we adopt the rule stated above:

(1) To allow a jury to apportion fault as it sees fit between negligent parties whose negligence was part of the legal and proximate cause of any loss or injury; and

(2) To apportion the total damages resulting from the loss or injury according to the proportionate fault of each party." Hoffman v. Jones, 287 So.2d 439.

The apportionment of damages between active joint tortfeasors is entirely consistent with the *Hoffman* policy. The Florida Supreme Court felt the best argument for adopting comparative negligence was its more equitable system of determining liability and its more socially desirable method of loss distribution:

"The rule of contributory negligence is a harsh one which either places the burden of a loss for which

two are responsible upon only one party or relegates to Lady Luck the determination of the damages for which each of two negligent parties will be liable. When the negligence of more than one person contributes to the occurrence of an accident, each should pay the proportion of the total damages he has caused the other party." Hoffman v. Jones, 280 So.2d at 437.

The same policy[8] dictates the abolishment of the equally harsh rule of no contribution among active tortfeasors.[9] This Court feels confident that the Supreme Court of Florida would agree.

■ Since the most equitable result that can be reached by a Court is the equation of liability with fault, the jury in the instant case will be permitted to apportion the damages if it be found that both defendants are actively liable.

## IS COMPARATIVE NEGLIGENCE A DEFENSE TO CLAIMS OTHER THAN SIMPLE NEGLIGENCE?

In this suit TECO claims that both defendants (1) were negligent in the design, manufacture and installation of Unit 6; (2) breached contractual obligations; and (3) breached implied warranties in connection with the sale and subsequent installation. Two additional claims are made against Westinghouse asking for breach of express warranty, one for punitive damages based on allegations of gross negligence.

The parties urge a ruling on whether the doctrine of comparative negligence adopted in Hoffman v. Jones, *supra,* can be used as a defense to the claims other than simple negligence.

8. *Dicta* is valuable in resolving *Erie* problems. Doucet v. Middleton, 328 F.2d 97, 101 (5 Cir.1964); Curtis Pub. Co. v. Cassel, 302 F.2d 132, 135 (10 Cir.1962).

9. The rule that there can be no contribution among joint tortfeasors had its origin in 1799, in Merryweather v. Nixan, 8 Term. Rep. 186, 101 Eng.Rep. 1337 (K.B.1799). In that case there had been a joint judgment against two defendants in an action for conversion, and that they had acted in concert, since they were joined at a time when joinder was only possible on this basis. One de-

fendant was denied contribution from the other, apparently because he had acted intentionally. The early American cases denied contribution in cases of willful misconduct, but allowed it where the tort committed by the one claiming contribution was a matter of negligence or mistake. But when joinder became possible in one action of those who had merely caused the same damage, the origin of the rule and the reason for it were lost to sight, and contribution was denied among all joint tortfeasors. W. Prosser v. Y. Smith, Torts, p. 328 (4th Ed. 1967).

**38**

Initially it should be made clear that the doctrine of comparative negligence is not a "defense" per se. The doctrine acts to diminish the damages the plaintiff is allowed to recover. It apportions damages based on the relative negligence of the parties.

It seems self evident that the negligence of the plaintiff cannot offset the damages flowing from a pure contractual claim except perhaps as evidence offered on the issue of mitigation of damages.

As to the bearing comparative negligence has on a breach of implied warranty claim, the answer is not so evident.

Breach of implied warranty has evolved into a form resembling the doctrine of strict liability. *See* Barfield v. United States Rubber Co., 234 So.2d 374 (2 D.C.A.Fla.1970), cert. denied 239 So.2d 828 (Fla.1970); Royal v. Black and Decker Manufacturing Co., 205 So. 2d 307 (3 D.C.A.Fla.1968), cert. denied 211 So.2d 214 (Fla.1970). *See also* Creviston v. General Motors Corp., 225 So.2d 331 (Fla.1969); Green v. American Tobacco Co., 154 So.2d 169 (Fla. 1963). Because there are compelling economic and social policy considerations buttressing strict liability for breach of implied warranty, most jurisdictions do not allow a plaintiff's contributory negligence to defeat recovery. In such jurisdictions it would be difficult for this Court to allow the doctrine of comparative negligence to offset the strict liability standard and thus undermine that policy. But Florida law is somewhat different. In some cases the Florida courts have allowed the defense of contributory negligence in implied warranty actions. In Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla.1958), the Florida Supreme Court held that the question of whether the purchaser had failed to ex-

ercise due care in using a product after being warned of its dangerous qualities should be presented to the jury. *Dicta* in Matthews v. Lawnlite Co., 88 So.2d 299 (Fla.1956) also discussed the applicability of contributory negligence to implied warranty claims. Moreover, some Florida courts have recognized a defense called "misuse of product" to offset recovery on implied warranty in a manner similar to contributory negligence. In Power Ski of Florida, Inc. v. Allied Chemical, 188 So.2d 13 (3 D.C.A. Fla.1966), the court was of the opinion that a manufacturer should not be liable for a product which fails because it was mishandled or misused. *See also* Noonan v. Buick Co., 211 So.2d 54 (3 D.C.A. Fla.), cert. denied 219 So.2d 698 (Fla. 1968). Coupling the spirit of comparative negligence with the precedent established by this line of cases, it appears the correct course of action would allow evidence of plaintiff's negligence to diminish the amount of his recovery on a claim of breach of implied warranty.

The comparative negligence doctrine will of course be invoked to offset the negligence claims made against defendants. Unfortunately a further problem arises in a case where, as here, a gross negligence allegation has been attached. In such a situation, the equitable course is to allow plaintiff's negligence to diminish its recovery of compensatory damages. If the defendants' negligence is truly "gross", the plaintiff's negligence will appear that much smaller in comparison. If the defendants' gross negligence will support an award of punitive damages, however, the plaintiff's comparative negligence will not be permitted to diminish the exemplary award. This procedure will equitably divide responsibility for claimed losses while keeping intact the policy of punishing wanton acts.