MILDRED J. LANE, administratrix, *vs.* ROBERT W. MESERVE
& another,[1] trustees.

Suffolk. April 10, 1985. — August 29, 1985.

Present: BROWN, CUTTER, & DREBEN, JJ.

*Negligence*, Railroad, Gross, Comparative, Wrongful death. *Practice, Civil*, Instructions to jury. *Damages*, Wrongful death, Punitive. *Evidence*, Expert opinion.

At the trial of a wrongful death action arising out of an accident in which the plaintiff's decedent, who had been ejected from a passenger train operated by the defendant because of his behavior, fell beneath the wheels of the train as he was attempting to reboard the train while it was leaving a station, a majority of the panel concluded that the evidence was sufficient to present a jury issue as to whether the defendant's employees had intentionally prevented the victim from reboarding the train and thereby had caused his fall. [660-662]

At the trial of a wrongful death action at which the jury were permitted to award compensatory damages to the plaintiff based on any degree of the defendant's negligence, including gross negligence, in accordance with the judge's instructions under G. L. c. 229, § 2, it was error requiring reversal to instruct the jury that they were not to consider the comparative negligence of the plaintiff's decedent in the event they found the defendant grossly negligent. [662-665]

A statement by an economist, in the course of his testimony at the trial of a wrongful death action at which compensatory damages were sought by the decedent's parents under G. L. c. 229, § 2, that he estimated the decedent's "expected lifetime net income" to be $476,000, would be admissible on retrial of the action, in the discretion of the judge, as being relevant to the amount of money the decedent would have been likely to contribute to his parents had he lived, provided that the figures were limited to the life expectancies of the parents and the survivor of them, that the defendant is afforded the opportunity of full cross-examination, and that the charge to the jury contains careful explanatory instructions. [666-667]

---

[1] Benjamin H. Lacy. The named defendants were appointed trustees of the property of the Boston & Maine Corporation and they are collectively referred to as the defendant.

CIVIL ACTION commenced in the Superior Court Department on November 15, 1978.

The case was tried before *Harry J. Elam*, J.

*Chester A. Janiak* for the defendants.

*Paul F. Markham* for the plaintiff.

DREBEN, J. The defendant appeals from a judgment entered on a jury verdict awarding $200,000 damages to the plaintiff pursuant to G. L. c. 229, § 2 (see note 5, *infra*), on account of the death of Kevin Lane (Lane), the plaintiff's decedent. We reverse because there was error in the judge's charge.

Lane, a nineteen year old student, died when he fell beneath the wheels of a passenger train operated by the defendant as Lane was attempting to reboard the train as it left the Montserrat Street station in Beverly. He had taken the train at Boston after attending a rock concert. Because of his behavior[2] he had been ejected from the train at the Montserrat Street station, as had two other persons.

1. *Claim of insufficient evidence.* The defendant argues that the jury were presented with "a single theory of liability — employees of the [defendant] intentionally prevented Lane from reboarding the train" and that there was no evidence to support that claim. A majority of the panel disagrees with this contention.

The two other persons removed from the train, Scott Silva and Walter White, were witnesses called by the plaintiff at trial. Silva testified that a man with a blue uniform "grabbed me by [the] hair and threw me down the stairs," that White had also been thrown off, and that "another kid [Kevin Lane] got thrown off" at the other end of the train. Silva and White "yelled to Kevin to come on. We were going to try to get back on." Lane caught up and "got in between me and Walter . . . . Walter jumped on, climbed the stairs, and he got on . . . . [Kevin was] [r]ight behind him . . . . Then I saw Kevin grab

---

[2] At trial, there was evidence that he had urinated out of a car of the train, had shoved other people, and had attempted to climb on top of the roof of the train while it was in motion. If this evidence was believed, it was sufficient to justify Lane's ejection from the train and may also have shown a violation of law. See G. L. c. 272, § 43.

onto the handle as you go up the stairs. The next thing you know, his hand had come off and he went between the train."[3]

White testified that he "was grabbed by the back of the hair and escorted off the train." Thereafter, he, Silva and Lane decided that they would try to reboard the train. As the train started to pull away, the three started running. Silva and Lane were behind White. White jumped aboard. He "could see the conductors coming through the door . . . . [T]hey were going to try and stop me to get on [*sic*], and I pushed my way through . . . . [T]hey were going to try to push me off, but I just pushed my way right through them."

White's testimony that the defendant's employees attempted to prevent him and, by reasonable inference, Lane, from reboarding the train was reinforced by a security officer who was one of the defendant's witnesses. He testified that he had seen Lane looking "as though he were going to board the train again," and had told him "don't bother, don't try it."

No witness saw any employee of the defendant do anything to prevent Lane from reboarding the moving train, obviously a dangerous attempt in any circumstance. A jury could have found that Lane merely slipped and fell or lost his grip on some part of a car as the train gained speed. That, however, is not the only permissible inference. We conclude, as did the trial judge in ruling on the defendant's motion for a directed verdict,[4] that the evidence, looked at in the light most favorable to the plaintiff, was sufficient. A jury could have inferred that the conductors who had tried to prevent White from reboarding

---

[3] Silva also testified that after the incident one of the policemen on the train asked him "How's your buddy, number 16's, legs?" Lane had been wearing a football shirt with the number 16. The defendant objected to this evidence because it claimed that the person making the statement had not been shown to be an agent of the defendant. As we do not rely on this statement, we do not consider it necessary to determine whether there was sufficient evidence for the jury to infer that the policeman was an agent of the defendant. Additional evidence on the question of agency may be available at a new trial.

[4] At the hearing on the defendant's motion (and on the plaintiff's motion to amend) the judge asked: "Didn't [White] testify that as he got aboard the train that there were two personnel of the B & M Railroad that tried to keep him off, that he got by them. He further testified that Kevin Lane was

also had attempted to stop Lane and thereby had caused his fall.*

2. *Error in the charge.* The judge instructed the jury on negligence, gross negligence, and wilful, wanton and reckless conduct. All these terms are used in G. L. c. 229, § 2, which is set forth in relevant part in the margin.[5] The judge's initial instructions did not include a discussion of Lane's negligence but only informed the jury of the consequences of the defend-

---

directly behind him and couldn't a reasonable inference be drawn that these employees may very well have caused Kevin Lane to fall?" The judge also asked, "[I]sn't it likely . . . that the B & M employees . . . [having put Lane off] would try to keep him from getting back on as well? Isn't that a reasonable inference that can be drawn from all the circumstances and all the facts in the case; that they wanted to put him off, that they wanted to keep him off?"

* Justice Cutter concurs in the general result but does not join in portions of part 1. He is of opinion that, from all the evidence, and not merely that concerning the events at Montserrat Street station (which he regards as insufficient by itself), the jury conceivably could have found some basis for concluding that the defendant was subject to liability because of its dealings with Lane.

[5] General Laws c. 229, § 2 (as amended through St. 1973, c. 699, § 1), provides: "A person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, or (3) operates a common carrier of passengers and by his negligence causes the death of a passenger, or (4) operates a common carrier of passengers and by his willful, wanton or reckless act causes the death of a passenger under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted . . . shall be liable in damages in the amount of: (1) the fair monetary value of the decedent to the persons entitled to receive the damages recovered, as provided in section one, including but not limited to compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to the damages recovered; (2) the reasonable funeral and burial expenses of the decedent; (3) punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant; except that . . . (2) a person operating a railroad shall not be liable for negligence in causing the death of a person while walking or being upon such railroad contrary to law or to the reasonable rules and regulations of the carrier . . . ."

ant's conduct. After the judge had completed his charge, the defendant, at a bench conference, noted that the judge had failed to instruct the jury on comparative negligence and requested that the jury be informed that, if they should find that both Lane and the defendant had been negligent, they were to compare the percentage of Lane's negligence with the negligence or gross negligence, if any, of the defendant.

The judge properly charged the jury as to comparative negligence in the event that they should find both Lane and the defendant negligent. If, however, they should find the railroad guilty of gross negligence or wilful and wanton conduct, they were not to take into account Lane's negligence. The judge said, "Gross negligence or . . . wilful, wanton misconduct offsets any negligence that may be attributed to the plaintiff in this case."

In the circumstances, we consider it error to have charged the jury that they were not to consider Lane's negligence if they should find the defendant grossly negligent.[6] Under G. L. c. 229, § 2, see note 5, *supra*, the only relevance of a finding of gross negligence is that such a determination authorizes the jury to award punitive damages. The judge, however, did not make clear to the jury that gross negligence was pertinent only for that purpose.[7]

He read them portions of G. L. c. 229, § 2, and instructed them that there were three different categories of conduct, negligence, gross negligence, and wilful, wanton and reckless conduct. Each was explained, and the jury were told that if they should find any of the three and that such conduct was the proximate cause of Lane's death, the defendant would be liable in damages. "Gross negligence" was defined as a "greater degree of negligence, . . . an act or an omission of a legal duty of an aggravated character as distinguished from a mere

---

[6] The judge was correct in instructing the jury that they were not to take Lane's negligence into account if they found employees of the defendant had engaged in wilful or wanton misconduct.

[7] The plaintiff's argument that the failure of the jury to award punitive damages makes the error harmless is, therefore, incorrect.

failure to exercise ordinary care."[8] The judge also pointed out that while gross negligence is different in degree from negligence, wilful, wanton and reckless conduct is different in kind.

Had the jury been instructed that, if they should find the defendant grossly negligent, they were not to take Lane's negligence into account *in assessing punitive damages*, the instruction would have been proper. The comparative negligence statute, G. L. c. 231, § 85,[9] refers only to "damages for negligence," and we construe the statutory language as meaning compensatory damages only. Lane's comparative negligence, if any, would not, therefore, reduce an exemplary award. As pointed out in *Tampa Elec. Co.* v. *Stone & Webster Engr. Corp.*, 367 F. Supp. 27, 38 (M.D. Fla. 1973) (construing Florida law), "This procedure will equitably divide responsibility for claimed losses while keeping intact the policy" of permitting a separate award to punish a grievous wrongdoer. See *Amoco Pipeline Co.* v. *Montgomery,* 487 F. Supp. 1268, 1272 (W.D. Okla. 1980) (construing Oklahoma law). See also Schwartz, Comparative Negligence § 5.4, at 109-111 (1974).

The instruction to disregard Lane's negligence was not, however, limited to the assessment of punitive damages. Where, as here, the jury were permitted to award compensatory damages based on any degree of negligence, including gross negligence, it was error to instruct that they were not to consider Lane's comparative negligence in the event they found the defendant grossly negligent. See *Tampa Elec. Co.* v. *Stone & Webster Engr. Corp.,* 367 F. Supp. at 38.

---

[8] The definition of gross negligence as a degree of negligence was in accord with long-standing Massachusetts authority. See, e.g., *Altman* v. *Aronson*, 231 Mass. 588, 591-592 (1919); *Davis* v. *Walent*, 16 Mass. App. Ct. 83, 92-93 (1983).

[9] In relevant part, G. L. c. 231, § 85 (inserted by St. 1973, c. 1123, § 1), provides: "Contributory negligence shall not bar recovery in any action by any person or legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the total amount of negligence attributable to the person or persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made."

Prior to the amendment of G. L. c. 231, § 85, to provide for comparative negligence, see St. 1969, c. 761, § 1, contributory negligence was an affirmative defense to actions based on gross negligence. See *Altman* v. *Aronson*, 231 Mass. 588, 592 (1919); *Dinardi* v. *Herook*, 328 Mass. 572, 575-576 (1952). There is nothing in the comparative negligence statute to indicate an intent to change prior law so as to eliminate consideration of the plaintiff's negligence in cases involving a greater degree of negligence, that is, gross negligence. Rather, the statute suggests that a jury need no longer be concerned with the point at which ordinary negligence becomes gross negligence but are directed to compare the negligence of the parties, whatever the degree of the defendant's negligence. See *Tampa Elec. Co.* v. *Stone & Webster Engr. Corp.*, 367 F. Supp. at 38 (construing Florida law); *Draney* v. *Bachman*, 138 N.J. Super. 503, 506-514 (1976); *Bielski* v. *Schulze*, 16 Wis. 2d 1, 14-19 (1962); *Danculovich* v. *Brown*, 593 P.2d 187, 192-193 (Wyo. 1979). But see *Ryan* v. *Foster & Marshall, Inc.*, 556 F.2d 460, 465 (9th Cir. 1977) (construing Oregon law), and compare with *Johnson* v. *Tilden*, 378 Or. 11, 17 (1977).

Since the jury may have found for the plaintiff on the basis of gross negligence on the part of the defendant's employees (one of the three categories of conduct resulting in liability contained in the judge's charge), we reverse.[10]

---

[10] Special verdicts or questions would be helpful in assisting the jury in sorting out the various theories of liability in this case and in testing whether particular answers to such questions are supported by the evidence. The plaintiff claims that the railroad acted unreasonably in ejecting Lane and that Lane never lost his status as a passenger. The defendant claims it did act reasonably and that the only duty it had to Lane was not to act wilfully and wantonly. See the last clause of G. L. c. 229, § 2, reproduced at the end of note 5, *supra*. Thus, in addition to the complex questions of computing damages if both Lane and the defendant are found negligent, the jury must determine what the conduct of Lane was on the train and what it was after he had been ejected. A separation of the issues involving the duty of care and of the respective negligence of each party, if any, seems here appropriate. See *McCue* v. *Prudential Ins. Co.*, 371 Mass. 659, 666 (1976). See also Smith & Zobel, Rules Practice §§ 49.2 & 49.3 (1977).

3. *Expert testimony*. We also discuss the question of the admissibility of the testimony of the plaintiff's expert as it may arise on retrial. General Laws c. 229, § 2, see note 5, *supra*, provides that compensatory damages in a death action shall be in the amount of "the fair monetary value of the decedent" to the persons entitled to receive the damages, including the "loss of the reasonably expected net income" to such persons.

An economist, an expert witness for the plaintiff, testified that he estimated Lane's "expected lifetime net income" (based on Lane's projected earnings as a cook less his personal expenses) to be $476,000. The defendant moved that the testimony be struck on the ground that this figure was not material to the amount called for by the statute, *i.e.*, the pecuniary loss to his parents. It is claimed that the amount is too high, both because it is based on Lane's lifetime rather than on the shorter projected lifespan of Lane's parents and because it is not limited to the portion of Lane's income which would have gone to his parents. We think that, with appropriate explanation of their limited relevance, a judge, in his discretion, might determine that figures of projected income (less expenses) for a period of the common lifetime(s) of the decedent and of his beneficiaries would aid the jury. See *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982). Information as to the decedent's future prospects has some relevance to the amount he is likely to contribute to his parents. The discretion of a trial judge to admit similar evidence has been upheld elsewhere. See *Meissner* v. *Smith*, 94 Idaho 563, 570 (1972); *Heppner* v. *Atchison, T. & S. Fe Ry.*, 297 S.W.2d 497, 507 (Mo. 1956). Caution, however, must be used in admitting such evidence, and the testimony should be linked as closely as possible to the statutory elements. For example, any figures in this case should be limited to the common life expectancies of Lane and his beneficiaries. A bare statement of Lane's projected earnings without an explanation would be improper. See *Bartkowiak* v. *St. Adalbert's Roman Catholic Church Soc.*, 40 A.D.2d 306, 311 (N.Y. 1973).

We recognize that there is substantial authority for excluding calculations of projected earnings unrelated to contributions to

the household. See *Wetherbee* v. *Elgin, Joliet & Eastern Ry.*, 191 F.2d 302, 311 (7th Cir. 1951), cert. denied 346 U.S. 867 (1953); *Mullins* v. *Seals*, 562 F.2d 326, 328-329 (4th Cir. 1977) (construing Virginia law); *Riksem* v. *Hollister*, 96 Idaho 15, 16 (1974). See also *Allendorf* v. *Elgin, Joliet & Eastern Ry.*, 8 Ill. 2d 164, 173, 177-178, cert. denied, 352 U.S. 833 (1956) (suggesting that an expert, instead of estimating the projected earnings of a decedent, should give the jury a formula for calculating lost contributions and should use neutral figures, e.g., the value of $1 per month payable at the end of each month for periods of ten, twenty, or thirty years).

We decline, however, to adopt a blanket rule of exclusion. The amount of damages to be awarded in this kind of case is, to a large extent, dependent on probabilities, and many contingencies enter into the calculation. See *Cross* v. *Sharaffa*, 281 Mass. 329, 330-332 (1933). It seems preferable to leave to the judge discretion to admit expert testimony of Lane's future prospects during the relevant period if he or she deems it helpful to the jury. The defendant must, however, be afforded the opportunity of full cross-examination, and the charge should contain careful explanatory instructions.

4. Other questions raised by the defendant are unlikely to arise at retrial. We note that it will be incumbent on the plaintiff to show, prior to the introduction of any admissions against the defendant, that they are properly attributable to it.

For the reasons set forth in part 2 hereof, the judgment is reversed, and the case is remanded to the Superior Court for a new trial.

*So ordered.*